CHRISTOPHER DINGWELL, SR., :
  Plaintiff, :
   :  No. 3:17-CV-01531 (VLB)
 v. :
   :
JEFFRY COSSETTE, JOHN :  June 7, 2018
WILLIAMS, CITY OF MERIDEN, :
  Defendants. :
   :
   :
   :

## MEMORANDUM OF DECISION ON MOTION TO DISMISS [DKT. 25]

Christopher Dingwell, Sr. ("Plaintiff" or "Dingwell, Sr.") brings this First Amendment retaliation civil rights case, pursuant to 42 U.S.C. § 1983, against Defendants the City of Meriden ("City"), Chief of Police Jeffrey Cossette ("Police Chief Cossette"), and Detective John Williams for various retaliatory actions allegedly taken against him for publicly criticizing the Meriden Police Department (Police Department").  Defendants have filed a Motion to Dismiss for failure to state a claim upon which relief may be granted.  For the following reasons, this motion is DENIED.

## Background

The City is a political subdivision of the State of Connecticut under Conn. Gen. Stat. § 52-557n(a)(1) and has a police department as provided by the Meriden Charter.  [Dkt. 21 (Am. Compl.) ¶¶ 5–6].  Police Chief Cossette was employed by the City and entitled to appoint officers and employees of the Police Department. *See id.* ¶ 8.  Detective Williams was the President of the Meriden Police Union at all times relevant to this case.  *See id.* ¶ 4.  The Amended Complaint alleges all

Defendants "were charged with the preservation of the public peace, prevention of crime, apprehension of criminals, regulation of traffic, protection of the rights of persons and property and enforcement of the laws of the state and the ordinances of the City of Meriden, and all rules and regulations made in accordance therewith." *Id.* ¶ 9. The Police Department maintains a Facebook page on which the public can post comments. During all relevant instances, Detective Williams and Police Chief Cossette were acting within the scope of their employment and all Defendants were acting under the color of state law. *See id.* ¶¶ 10–11.

Mr. Dingwell, Sr. is a resident of the City and he has a son named Christopher Dingwell, Jr. ("Dingwell, Jr."). *See id.* ¶¶ 1–2. He describes himself as a "concerned citizen and taxpayer" of the City who "engaged in speech" to "bring to light inefficiencies and inadequacies to further transparency between the police and the people they serve and protect." *Id.* ¶ 12.

One of Mr. Dingwell, Sr.'s strategies was to publicly post criticisms on the Police Department Facebook page, and on an undisclosed date he was blocked from posting. *See id.* ¶¶ 13–14. The American Civil Liberties Union ("ACLU") contacted the Police Department on his behalf, *see id.* ¶ 15, but the Amended Complaint does not indicate his access was restored. From 2014 on, Mr. Dingwell, Sr. informed members of the local press corps about Police Department's irregularities. *See id.* ¶ 17.

In January 2015, Mr. Dingwell, Sr. became aware that two firearms were possibly missing from the Meriden Police Department armory. *See id.* ¶ 18. On

unspecified dates, he called and texted Larue Graham of the Public Safety Committee and Mayor Kevin Scarpetti; he notified the Bureau of Alcohol, Tobacco, & Firearms ("ATF"); and he reported the issue to the State Police. *See id.* ¶ 19–22. He also reported the incident to a Meriden newspaper, the Record Journal, which published the story; the Police Department stated "in explicit terms" that it "was angry with him for leaking the story to the public." *Id.* ¶ 28–29. The date of this incident is unknown as well.

On November 9, 2015, an officer stopped Mr. Dingwell, Sr. for speeding and having impermissibly tinted windows. *See id.* ¶ 23. Mr. Dingwell, Sr. disputed both issues and the ticket was ultimately thrown out. *See id.*

In early March 2016, Mr. Dingwell, Sr. was asked to meet an officer of the Meriden Police Department in a parking lot. *See id.* ¶ 24. The Amended Complaint alleges the unnamed officer warned him that the Meriden Police Department would "go after his family if necessary" if he did not abandon pursuit of the missing firearms story. *See id.* On March 26, 2016, Mr. Dingwell's son was a passenger in a car that was pulled over by the Meriden police. *See id.* ¶ 30. Mr. Dingwell, Jr. was arrested and charged with possession of a facsimile firearm, possession of a weapon in a motor vehicle, tampering with evidence, carrying a dangerous weapon, and conspiracy to carry a dangerous weapon. *See id.* ¶ 31.

On March 27, 2016, Detective Williams sent Police Chief Cossette an email with the subject: Chris Dingwell. *See* [Dkt. 21 ¶ 30]. Detective Williams stated, "As Union President, I am respectfully requesting that the Police Department complete a press release for distribution tomorrow to not only our local press but

our Facebook as well" regarding the arrest of Mr. Dingwell, Jr. of which "during the stop Chris Dingwell[']s . . . son threw a facsimile firearm out of the car." [Dkt. 23].[1] The email also states the following:

> More importantly is the fact that Chris Dingwell is one of the most outspoken citizens against this Administration and Department. Yet, here is the second of his two kids who are criminals and creating crime in our City. This case should be exploited for what it is, not only excellent work on the part of our men and women of this agency but the fact that this is the guy who touts his inner knowledge and workings of the Police Department and has an association with a rat or two from within our Department. Yet he does . . . nothing to make this Community better and instead has created drama for the real citizens of this City.

*Id.* Dingwell, Jr.'s arrest was published on the Police Department Facebook page, the Record Journal, and other news outlets. *See* [Dkt. 21 ¶¶ 32–34].

Several months later on September 6, 2016, Mr. Dingwell, Sr. spoke at a City Council meeting and criticized the Police Department's lack of transparency. *Id.* ¶ 40. When he entered, an unnamed officer told him to "keep quiet and lay low during the meeting." *Id.* ¶ 42. He nonetheless raised issues with (a) increased gang violence; (b) a nine-day delay on publicly reporting a murder; (c) the misplacement of a gun resulted in a defendant to "walk"; and (d) his request that Police Chief Cossette be fired. *See id.* ¶ 41.

Mr. Dingwell, Sr. thereafter sent emails to "officials" of the Police Department about public safety concerns. *Id.* ¶ 43. On November 15, 2016, Detective Williams responded to one of his emails and stated that "[a]ny further

---

[1] This email is incorporated by reference into the Amended Complaint. *See* [Dkt. 21 ¶¶ 36–38]; *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007).

emails from you to me that are not official City business will be followed up with a Criminal investigation." *Id.* ¶ 45.

In December 2016, Mr. Dingwell, Sr. learned that a security detail had been placed on him. *See id.* ¶ 49. He then "became afraid to engage in public speech" against the Meriden Police Department. *Id.* ¶ 50. An internal investigation about Captain Patrick Gaynor ("Captain Gaynor") was published in April 2017, and the content of the investigation revealed conversations between Captain Gaynor and Mr. Dingwell, Sr. were monitored. *See id.* ¶ 51–53. An excerpt of the internal investigation was submitted by Defendants and indicates Captain Gaynor was determined by a preponderance of the evidence to have engaged in violations of the Police Department Rules and Regulations, some of which appear to be related to Captain Gaynor allegedly giving internal Meriden Police Department information to Mr. Dingwell, Sr. *See generally* [Dkt. 25-2 (Mot. Dismiss Ex. A)].

<u>Legal Standard</u>

To survive a motion to dismiss, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In considering a motion to dismiss for failure to state a claim, the Court should follow a "two-pronged approach" to evaluate the sufficiency of the complaint. *Hayden v. Paterson*, 594 F.3d 150, 161 (2d Cir. 2010). "A court 'can choose to begin by identifying pleadings that, because they are no more than

conclusions, are not entitled to the assumption of truth.'" *Id.* (quoting *Iqbal*, 556 U.S. at 679). "At the second step, a court should determine whether the 'wellpleaded factual allegations,' assumed to be true, 'plausibly give rise to an entitlement to relief.'" *Id.* (quoting *Iqbal*, 556 U.S. at 679). "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (internal quotations omitted).

In general, the Court's review on a motion to dismiss pursuant to Rule 12(b)(6) "is limited to the facts as asserted within the four corners of the complaint, the documents attached to the complaint as exhibits, and any documents incorporated by reference." *McCarthy*, 482 F.3d at 191. The Court may also consider "matters of which judicial notice may be taken" and "documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit." *Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993); *Patrowicz v. Transamerica HomeFirst, Inc.*, 359 F. Supp. 2d 140, 144 (D. Conn. 2005).

## Analysis

Defendants move to dismiss the case in its entirety on several grounds. First, Defendants claim that Plaintiff has not properly pleaded a First Amendment retaliation claim as to any Defendant. Second, Defendants argue Plaintiff has not pleaded that Police Chief Cossette was directly involved or has supervisory liability under 42 U.S.C. § 1983. Third, Defendants dispute the City's liability under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 98 S. Ct. 2018, 56 L. Ed. 2d 611

(1978).  Fourth, it is Defendants' position that Police Chief Cossette and Detective Williams are entitled to qualified immunity.  The Court first addresses the First Amendment argument and then the legal argument as to each Defendant.

I.    First Amendment

"To state a claim under Section 1983, a plaintiff must allege facts indicating that some official action has caused the plaintiff to be deprived of his constitutional rights—in other words, there is an injury requirement to state the claim." *Colombo v. O'Connell*, 310 F.3d 115, 117 (2d Cir. 2002) (per curiam).  A plaintiff may recover under § 1983 by asserting violation of his First Amendment rights.  *See Connell v. Signoracci*, 153 F.3d 74, 79 (2d Cir. 1998).  A private individual who asserts a First Amendment violation must show: "(1) he has a right protected by the First Amendment; (2) the [defendants'] actions were motivated or substantially caused by [plaintiff's] exercise of that right; and (3) the [defendants'] actions caused him some injury." *Dorsett v. Cty. of Nassau*, 732 F.3d 157, 160 (2d Cir. 2013).  Defendants only challenge the third factor.

With respect to the third element, "[a] plaintiff has standing if he can show either that his speech has been adversely affected by the government retaliation or that he has suffered some other concrete harm." *Id.*  "Hurt feelings or a bruised ego are not by themselves the stuff of constitutional tort." *Zherka*, 634 F.3d at 645–46. Examples of a concrete harm include "loss of business or some other tangible injury. . . ." *Zherka v. Amicone*, 634 F.3d 642, 646 (2d Cir. 2011) (addressing a First Amendment retaliation action where the defendants' alleged retaliation constituted defamatory statements, and the court found such

statements not concrete without more); *see Smith v. Campbell*, 782 F.3d 93, 100 (2d Cir. 2015) (ruling "issue of the tickets was an injury in that it subjected her to a state action requiring that she either appear in court, pay a fine, or both"); *Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals*, 282 F.3d 83, 91 (2d Cir. 2002) (finding injury when the defendants revoked plaintiff's permit); *Marom v. City of New York*, No. 15-cv-2017 (PKC), 2016 WL 916424, at *11 (S.D.N.Y. Mar. 7, 2016) ("Criminal charges qualify as 'some other concrete harm.'") (quoting *Smith*, 782 F.3d at 100); *Vaher v. Town of Orangetown, N.Y.*, 916 F. Supp. 2d 404, 431–32 (S.D.N.Y. 2013) ("Here, Plaintiff has alleged various injuries resulting from Defendants' retaliatory conduct, including harm to his professional reputation, temporary modification of his job responsibilities, further harassment and intimidation by Defendants and economic and pecuniary loss."). A plaintiff may also show that his speech was "actually chilled" and that defendants' actions caused a change in behavior. *See id.* at 646; *Curley v. Village of Suffern*, 268 F.3d 65, 73 (2d Cir. 2001).

### A. *Blocking Mr. Dingwell, Sr.'s Facebook Access*

The Amended Complaint alleges that Mr. Dingwell was "publicly critical" of the Meriden Police Department and one of the manners in which he did so was by "posting on their Facebook page." [Dkt. 21 ¶ 13]. On an undisclosed date, the Meriden Police Department blocked him from posting on their Facebook page. *See id.* ¶ 14. He contacted the ACLU, which in turn contacted the Meriden Police Department, but the Amended Complaint does not clarify whether he was thereafter allowed to publish on the Facebook page. However, what is clear is

that he was unable to express his views on the Police Department Facebook for some period of time as were other members of the public.

The parties did not brief whether blocking Mr. Dingwell from posting on the Police Department Facebook page satisfies the First Amendment retaliation standard and focus instead on the subsequent actions taken by employees of the Police Department, the Court is troubled by the decision to block Mr. Dingwell's access to this public forum in light of a recent First Amendment case, *Knight First Amendment Inst. at Columbia Univ. v. Trump*, --- F. Supp. 3d ---, 2018 WL 2327290 (S.D.N.Y. May 23, 2018), issued by Judge Naomi Reice Buchwald of the Southern District of New York. Although *Columbia Univ. v. Trump* is not a First Amendment retaliation case (as is the case here) the Court nonetheless finds much of the reasoning of *Columbia Univ. v. Trump* enlightening. In that case, Judge Buchwald declared that "the blocking of the individual plaintiffs from the @realDonaldTrump [Twitter] account because of their expressed political views violates the First Amendment. *Id.* *24. The district court ruled that the plaintiffs' desire to criticize President Trump and "engage in political speech" is decidedly "within the core of First Amendment protection." *See id.* at * 13. Although Defendants do not dispute the first prong of the First Amendment retaliation claim, the Court views Judge Buchwald's ruling worth noting.

The Court also finds the discussion on blocking access to social media helpful for the third element of the First Amendment retaliation claim. With respect to blocking the plaintiffs' @DonaldTrump Twitter access, the court reasoned:

> When a user is blocked, the most significant impediment is the ability to directly interact with a tweet sent by the blocking user. While a blocked user is also limited in that the user may not view the content of the blocking user's tweets or view the blocking user's timeline, those limitations may be circumvented entirely by using an internet browser or other application that is not logged in to Twitter, or that is logged in to a Twitter account that is not blocked. By contrast, the ability to interact directly cannot be completely reestablished, and that ability—*i.e.,* access to the interactive space—is therefore best described as the access that the individual plaintiffs seek.

*Id.* at *19 (internal quotation marks and citations omitted). The court then stated that "the blocking of the individual plaintiffs has the discrete impact of preventing them from interacting directly with the Presidents' tweets, thereby restricting a real, albeit narrow, slice of speech;" the court concluded, "No more is needed to violate the Constitution." *Id.* at *22. This language informs the third prong of the First Amendment retaliation standard, because the blocking of Facebook access is by its nature an injury even if it is only a minimal constitutional violation. *See generally Hoefer v. Bd. of Educ. of the Enlarged City Sch. Dist. of Middletown*, No. 10 Civ. 3244 (ER), slip op. at 5 (S.D.N.Y. June 6, 2017) (stating in a First Amendment retaliation claim, "It has long been established that any prior restraint is an extraordinary remedy, and that there is a 'heavy presumption' against its constitutional validity.") (citing *United States v. Quattrone*, 402 F.3d 304, 309 (2d Cir. 2005)).

While this case involves Mr. Dingwell, Sr.'s access to posting on the Police Department's Facebook page, the access he seeks and the restrictions imposed appear to be substantively the same. In light of the similarities in which the two social media platforms operate and the public nature of the forum, the Court finds

Plaintiff has properly asserted a First Amendment retaliation claim with respect to the blocking of his access to the Meriden Police Department's Facebook page.

### B. *Meriden Police Department Actions from 2014 through 2016*

Mr. Dingwell, Sr. alleges that Defendants retaliated against him for exercising his First Amendment rights on several occasions from 2014 through December of 2016. The parties limit their briefing to the "chilling effect" Defendants' actions had on Mr. Dingwell. However, this analysis is short-sighted as there are myriad ways in which an individual may suffer an injury, and "chilling" is just one of many. *See Dorsett*, 732 F.3d at 160 ("Chilled speech is not the *sine qua non* of a First Amendment claim. A plaintiff has standing if he can show either that his speech has been adversely affected by the government retaliation or that he has suffered some other concrete harm. Various non-speech related harms are sufficient to give a plaintiff standing.").

It is well-settled in this Circuit that "[i]t is a basic principle of tort law in general, and of civil rights law in particular, that compensable injuries may include not only monetary losses such as out-of-pocket expenses but also injuries such as 'personal humiliation' and 'mental anguish.'" *Henry v. Gross*, 803 F.2d 757, 768 (2d Cir. 1986); *Bernheim v. Litt*, 79 F.3d 318, 325–26 (2d Cir. 1996) (citing *Henry* in a First Amendment retaliation employment case on a motion to dismiss). Continuous harassment is a cognizable injury when it results in emotional distress. *See Bernheim*, 79 F.3d at 325–26 (where the complaint asserted plaintiff "endured a campaign of harassment, which caused her great worry and unhappiness," the Second Circuit found such allegations "could

reasonably be read as a claim for emotional distress, a legally recognized and compensable harm) (internal quotation marks omitted); *Vaher*, 916 F. Supp. 2d at 431–32 (concluding "harassment and intimidation by Defendants" constituted an injury for a First Amendment retaliation claim).

The Court accepts the facts in the Amended Complaint as true for the purposes of this motion and finds they plausibly demonstrate Mr. Dingwell, Sr. suffered an injury cognizable as a First Amendment retaliation claim. Mr. Dingwell learned that two firearms were possibly missing from the Meriden Police Department armory in January 2015 and on undisclosed dates he reported these issues to various Meriden officials as well as the ATF, State Police, and the Record Journal. *See* [Dkt. 21 ¶¶ 18 –22, 28-29]. On November 9, 2015, he was stopped for speeding and was accused of having impermissibly tinted windows. *See id.* ¶ 23. While the Amended Complaint does not indicate Mr. Dingwell, Sr. subsequently made any public speech about the missing firearms, it does allege that four months later in March 2016, a Meriden police officer asked to meet him in a parking lot and threatened that "if he did not leave the story alone, the Department would . . . go after his family if necessary." *Id.* ¶ 24. Only a few weeks later, Mr. Dingwell, Sr.'s son was arrested, charged with several crimes, and the Meriden Police Department issued a Facebook post and notified the newspapers of the incident. The Facebook post referred only to "Christopher Dingwell" and did not clarify who had been arrested. *See id.* ¶ 33. The Court finds Mr. Dingwell, Jr.'s arrest could be understood as making good on the police officer's threat to "go after his family," particularly in light of the close temporal

proximity. That the Facebook post did not specify the suffix bolsters the inference that the Police Department intentionally sought to discredit Mr. Dingwell, Sr.

The Police Department continued to interact with Mr. Dingwell, Sr. in what could be construed as attempts to threaten or intimidate him. On September 6, 2016, he "engaged in speech publicly, at the City Council meeting, openly criticizing the lack of transparency with the Meriden Police Department and its citizens." *Id.* ¶ 40. Prior to speaking, a police officer told him to "keep quiet and lay low," but nonetheless he "continued to voice his concerns despite the rather ominous message to keep quiet at that meeting." *Id.* ¶¶ 42–43. Only two months later in November 2016, in response to Mr. Dingwell, Sr.'s emails to Meriden Police Department officials "about issues concerning the public safety of the citizens of Meriden," [Dkt. 21 ¶ 44], Detective Williams wrote in an email to Mr. Dingwell, Sr. stating that "[a]ny further emails from you to me that are not official City business will be followed up with a Criminal investigation." [Dkt. 21 ¶ 45]. The very next month, Mr. Dingwell, Sr. learned that he had a surveillance detail placed on him—yet again, there is a temporal proximity between an alleged threat and the Police Department's actions consistent with the threat. *Id.* ¶ 49. This caused him to be "afraid to engage in public speech against the Meriden Police Department as he used to." *Id.* ¶ 50.

Defendants attempt to defeat Mr. Dingwell, Sr.'s First Amendment retaliation claims on the basis that he continued to speak publicly at the September 2016 City Council meeting, but this argument fails to consider Mr.

Dingwell, Sr.'s actual injury. It is true that "[w]here a party can show no change in his behavior, he has quite plainly shown no chilling of his First Amendment right to free speech."). *See Curley*, 268 F.3d at 73. Perhaps the parking lot warning and Mr. Dingwell, Jr.'s arrest were not sufficient to curtail Mr. Dingwell, Sr.'s speech at that moment. But in viewing the Amended Complaint in a light favorable to Mr. Dingwell, Jr., the parking lot incident and arrest, the police officer's contact at the City Council meeting, Detective Williams's warning of a criminal investigation, and the initiation of an investigation can be considered "a campaign of harassment" or a series of intimidation tactics that caused Mr. Dingwell, Sr. emotional distress, including his fear to publicly speak after learning of the surveillance. *See Bernheim*, 79 F.3d at 325–26. This fear is an actual injury as it is more than "hurt feelings or a bruised ego." *See Zherka*, 634 F.3d at 645–46.

In addition, the facts as alleged quite clearly demonstrate the Police Department threats are not idle, but rather they become reality, and Mr. Dingwell, Sr.'s fear to speak publicly be construed as a "chilling effect" stemming from "a threat of specific future harm." *Lard v. Tatum*, 408 U.S. 408 U.S. 1, 13–14, 92 S. Ct. 2318, 33 L. Ed. 2d 154 (1972). The Court distinguishes this case from *Laird* in which the plaintiffs' alleged their First Amendment rights were chilled by "a governmental investigation and data-gathering activity" stemming from the United States Army's surveillance of public activities thought to have the potential for public disorder based on incidents in Detroit, Michigan shortly after Dr. Martin Luther King, Jr.'s assassination. *Id.* at 4–6, 10. The United States

Supreme Court discussed prior chilling decisions and observed that "[i]n none of these cases, however, did the chilling effect arise merely from the individual's knowledge that a governmental agency was engaged in certain activities or from the individual's concomitant fear that, armed with the fruits of those activities, the agency might in the future take some other and addition[a]l action detrimental to that individual." *Id.* at 11. Unlike *Laird*, this case does not involve just an investigation and it is not the existence of the investigation alone that is alleged to have chilled Mr. Dingwell, Sr.'s speech. Rather, the investigation dovetailed with Detective Williams's threat that he would open a criminal investigation against him, which is similar to the previous threat against his family that came shortly before his son's arrest. At this stage in the litigation, the Court finds the allegations sufficiently assert a chilling effect.

II. **Liability as to Each Defendant**

The Court must now assess whether each Defendant is liable for First Amendment retaliation.

A. *Personal Involvement: Police Chief Cossette*

"It is well-settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995) (citation and quotation marks omitted). A supervisory defendant's personal involvement may be alleged through facts that show: "(1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant

created a policy or custom under which unconstitutional practices occurred, or allowed continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of [others] by failing to act on information indicating that unconstitutional acts were occurring." *Id.*

The Amended Complaint sufficiently alleges Police Chief Cossette was personally involved in at least a portion of the activities giving rise to a First Amendment retaliation claim. Once Mr. Dingwell, Jr. was arrested, Detective Williams emailed Police Chief Cossette saying, "As Union President, I am respectfully requesting that the Police Department complete a press release for distribution tomorrow to not only our local press but our Facebook as well." [Dkt. 23]. He then went on to say his aim in posting notice of the arrest was to humiliate and discredit Mr. Dingwell, stating:

> More importantly is the fact that Chris Dingwell is one of the most outspoken citizens against this Administration and Department. This case should be exploited for what it is, not only excellent work on the part of our men and women of this agency but the fact that this guy who touts his inner knowledge and workings of the Police Department and has an association with a rate or two from within our Department. Yet he does not [sic] nothing to make this Community better and instead has created drama for the real citizens of this City.

*Id.* While the Court is not privy to Police Chief Cossette's response, the Amended Complaint can be construed to allege the Chief's permission was required to post notice of the arrest and expressly alleges that Detective Williams's request was granted as notice of the arrest was subsequently posted on Facebook and released to the press. Detective Williams's request to Police Chief Cossette strongly implies that it was not standard course to post or publicize all arrests;

accordingly, the Amended Complaint construed in the light most favorable to the Plaintiff Police Chief Cossette would have had to become directly involved as a supervisor to authorize the posting and press release. *See Colon*, 58 F.3d at 873. Even if he was not, his receipt of this email conferred an obligation to prevent Detective Williams from retaliating against Mr. Dingwell, Sr., who was not involved in the alleged unlawful activity and for all intents and purposes need not have been mentioned in that email. *See id.* Detective Williams's email reflects an intent to harm Mr. Dingwell, Sr. and a pluasible reading of the Amended Complaint is that Police Chief Cossette acted in gross negligence or with deliberate indifference to wrongful acts that could have potentially caused a constitutional violation.

### B. Monell *Liability: City of Meriden*

The Supreme Court has held that a municipality cannot be held liable on a *respondeat superior* theory. *Monell*, 436 U.S. at 691. The *Monell* Court held that "a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents." *Id.* at 694. Thus, to hold a municipality liable under 42 U.S.C. § 1983, a plaintiff must prove that the asserted violation of a federally protected right was caused by a municipal policy, a municipal custom or practice, or the decision of a municipal policymaker with final policymaking authority. *City of St. Louis v. Praprotnik,* 485 U.S. 112, 123, 108 S. Ct. 915, 99 L. Ed. 2d 107 (1988). A plaintiff must further demonstrate that, "through its deliberate conduct, the municipality was the 'moving force' behind the injury alleged." *Bd. of Cty. Comm'r v. Brown*, 520 U.S. 397, 404, 117 S. Ct. 1382, 137 L. Ed. 2d 626 (1997)

(emphasis in original). "That is, a plaintiff must show that the municipal action was taken with the requisite culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights." *Id.*

When a *Monell* claim is based on the decision of a municipal policymaker with final policymaking authority, a single action by such a decisionmaker is sufficient to confer municipal liability under § 1983. *See Amnesty Am. v. Town of West Hartford*, 361 F.3d 113, 126 (2d Cir. 2004). A policymaker with final policymaking authority is not the same as a lower-level municipal employees who has some level of authority, and the court must take care to distinguish between the two to avoid improperly using a *respondeat superior* theory. *See id.* When the constitutional violation is based on a subordinate employee's decision, a municipality is liable if the policymaker approved of the decision whether by action or omission. *See id.* A policymaker may do so by issuing an order or a ratification, or simply by being "aware of a subordinate's unconstitutional actions, and consciously cho[osing] to ignore them, effectively ratifying the actions." *Id.*

Detective Williams's email makes clear that Mr. Dingwell, Sr. was a known individual that had been frustrating the Police Department for quite some time. The email alerts Police Chief Cossette to this fact and it is reasonable to assume he may have been aware of other past incidents involving this individual or became aware of future incidents in the months to follow. It is undisputed that Police Chief Cossette holds a supervisory position with the Police Department; but this alone does not necessarily make him a policymaker. Whether a police

chief is a policymaker is fact specific and may require additional evidence. *See Jackson v. Williams*, No. 8:16-CV-1137 (LEK/CFH), slip op. at 1 (N.D.N.Y. Mar. 28, 2017) (citing cases finding police chiefs were and were not policymakers). The Court expresses no opinion at this stage whether Police Chief Cossette held policymaking authority, however, the Amended Complaint includes facts sufficient to allege the Chief had the authority to approve and did approve an act which the Chief knew was intended to harm Mr. Dingwell. Therefore, the Court finds the Amended Complaint properly alleges a *Monell* claim on the basis that he was aware of and ordered his subordinates' unconstitutional actions or alternatively consciously ignored them. *See Amnesty Am.*, 361 F.3d at 126; *See Goode v. Newton*, No.

3:12cv754 (JBA), 2013 WL 1087549, at *7 (D. Conn. Mar. 14, 2013) ("To survive a motion to dismiss, a *Monell* claim must include enough factual material to be plausible."). On this record, a challenge to the *Monell* claim is best raised through a motion for summary judgment.

### C. *Qualified Immunity: Police Chief Cossette and Detective Williams*

Qualified immunity must be decided "at the earliest possible stage in litigation." *Hunter v. Bryant*, 502 U.S. 224, 227, 112 S. Ct. 534, 116 L. Ed. 2d 589 (1991). When a qualified immunity defense is raised on a motion to dismiss, a court must follow a "more stringent standard applicable to this procedural route." *McKenna v. Wright*, 386 F.3d 432, 436 (2d Cir. 2004); *Lynch v. Ackley*, No. 3:12cv537 (JBA), 2012 WL 6553649, at *7 (D. Conn. Dec. 14, 2012) (ruling the defendant's "qualified immunity defense "'faces a formidable hurdle' at the Rule 12(b)(6) stage because 'the plaintiff is entitled to all reasonable inferences from

the facts alleged, not only those that support his claim, but also those that defeat the immunity defense.'") (citing *McKenna*, 386 F.3d at 434, 436)). "[F]acts supporting the defense" must be present "on the face of the complaint," and the motion can only be granted when "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief." *McKenna*, 386 F.3d at 436 (citing *Citibank, N.A. v. K–H Corp.*, 968 F.2d 1489, 1494 (2d Cir. 1992).

A defendant is entitled to qualified immunity when his conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738, 73 L. Ed. 2d 396 (1982). A "clearly established right" is one in which "(1) the law is defined with reasonable clarity, (2) the Supreme Court or the Second Circuit has recognized the right, and (3) a reasonable defendant [would] have understood from the existing law that [his] conduct was unlawful." *Luna v. Pico*, 356 F.3d 481, 490 (2d Cir. 2004) (internal quotation marks omitted). The doctrine of qualified immunity "is based on the proposition that public officers should freely act in pursuance of their duties without fear of being held liable for damages under constitutional standards of which they have no notice because the standards were not yet developed at the time of their conduct." *Lynch v. Ackley*, 811 F.3d 569, 578 (2d Cir. 2016); *Luna*, 356 F.3d 481 at 490 ("The doctrine protects officials who 'act in ways they reasonably believe to be lawful.'") (citing *Anderson v. Creighton*, 483 U.S. 635, 641, 107 S. Ct. 3034, 97 L. Ed. 2d 818 (1999)).

Mr. Dingwell, Sr. clearly exercised his First Amendment right to free speech when he publicly spoke about the lack of Police Department transparency on multiple occasions, including at public meetings and on a public social media portal. *See Dobosz v. Walsh*, 892 F.2d 1135, 1141 (2d Cir. 1989) (denying qualified immunity defense on summary judgment "[b]ecause the proscription of retaliation for a plaintiff's exercise of First Amendment rights has long been established"). Defendants seek to avoid liability under a qualified immunity defense on the basis that (1) Detective Williams sought to report about an arrest that was legitimately made; (2) Detective Williams asserted his own First Amendment rights in emailing Mr. Dingwell, Sr.; and (3) Police Chief Cossette did not take any actions other than receiving an email. These arguments do not, however, speak to the allegations about their retaliatory intent. *See generally Mandell v. Cty. of Suffolk*, 316 F.3d 368, 385 (2d Cir. 2003) ("Where specific intent of a defendant is an element of plaintiff's claim under clearly established law, and plaintiff has adduced sufficient evidence of that intent to defeat summary judgment, summary judgment on qualified immunity grounds is inappropriate."). Taking the Amended Complaint as true, it is plausible that Detective Williams and Police Chief Cossette colluded to publicly shame and discredit Mr. Dingwell, Sr. and his son about the arrest, thereby intimidating him from exercising his First Amendment rights; and that Detective Williams threatened and sought to intimidate Mr. Dingwell, Sr. from contacting him about matters of public concern. Discovery must be conducted so as to enable a determination as to whether their conduct was objectively reasonable. *See Lynch v. Ackley*, 2012 WL 6553649, at

*7.[2]  Indeed, Detective Williams specifically identified Mr. Dingwell, Sr. as "one of the most outspoken citizens against this Administration and Department."  [Dkt. 23].   It would be contrary to the purpose of the qualified immunity doctrine to construe it to allow a police department to intentionally silence its critics by using its power and authority, conferred to protect and defend the public, to threaten, intimidate, and embarrass members of the public they are empowered to protect. Given the early stage of litigation, the qualified immunity defense is denied without prejudice to refiling on summary judgment.

## Conclusion

For the above reasons, the Court finds that Plaintiff has properly alleged a First Amendment retaliation claim as to each Defendant.  The Court orders the stay to be lifted and the parties are re-initiate the discovery process.

The case will be referred to Magistrate Judge Robert A. Richardson for a settlement conference when the parties inform the court that a settlement conference may be fruitful.  Upon referral the parties must promptly contact his Chambers to schedule a settlement conference date.  The deadlines will not be extended to conduct or complete the settlement process.

IT IS SO ORDERED

---

[2] Defendants argue that the Second Circuit's decision in *Lynch v. Ackley*, 811 F.3d 569 (2d Cir. 2016) requires dismissal on qualified immunity grounds because Mr. Dingwell, Sr. was a known critic of the Police Department, Detective Williams's speech was itself protected, and Police Chief Cossette's actions were relatively benign.    *See* [Dkt. 27-1 at 16].    The Court does not find this case persuasive at this stage in the litigation because the facts are distinct and the Second Circuit addressed the case on summary judgment.    Notably, Judge Arterton denied qualified immunity at the pleading stage, leaving the door open for renewing the argument on summary judgment. *See Lynch v. Ackley*, No. 3:12-CV-537, 2014 WL 4782812, at *19–20 (D. Conn. Sept. 24, 2014).

_____/s/_____
**Hon. Vanessa L. Bryant**
**United States District Judge**

**Dated at Hartford, Connecticut: June 7, 2018**