# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| CHRISTOPHER DINGWELL, SR. | ) | 3:17-CV-01531 (KAD) |
| *Plaintiff*, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| JEFFRY COSSETTE, et al, | ) | |
| *Defendants*. | ) | September 30, 2020 |

## MEMORANDUM OF DECISION RE: DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (ECF NO. 68) AND DEFENDANTS' MOTION TO SUPPLEMENT THE SUMMARY JUDGMENT RECORD (ECF NO. 75)

Kari A. Dooley, United States District Judge

This civil rights case, brought pursuant to 42 U.S.C. § 1983, arises out of the alleged retaliatory actions by Defendants City of Meriden ("Defendant Meriden"), Jeffry Cossette, Chief of the Meriden Police Department ("Defendant Cossette"), and John Williams, a now former detective with the Meriden Police Department and President of the Meriden Police Union ("Defendant Williams"), in response to Plaintiff Christopher Dingwell Sr.'s public criticism of the Meriden Police Department ("MPD"). Plaintiff alleges that the Defendants retaliated against him as a result of the exercise of his First Amendment right to freedom of speech. Pending before the Court is the Defendants' motion for summary judgment.[1] For the reasons stated herein, Defendants' motion for summary judgment is GRANTED in part and DENIED in part.

**Allegations**

By amended complaint dated November 7, 2017, Plaintiff makes the following allegations. Beginning in 2014, Plaintiff, as a concerned, tax-paying Meriden citizen, engaged in public speech

---

[1] Also pending before the Court is Defendants' motion to supplement the summary judgment record. (ECF No. 75). Upon review of the document that Defendants would like to include in the record, the Court finds that it would neither contribute to the Court's analysis nor would it otherwise affect the Court's decision. The Defendants' motion to supplement the summary judgment record is DENIED.

against the interests of the MPD to reveal its inefficiencies and to promote transparency. For example, in January 2015, Plaintiff became aware of two firearms allegedly missing from the MPD's armory. After Plaintiff notified both local and federal authorities, the MPD reported to Plaintiff that the firearms had been stripped down and destroyed. Not believing the MPD, Plaintiff notified the Record-Journal, a local newspaper, about the missing firearms. Thereafter, the Record-Journal published a story regarding the allegations.

Because of his public criticism of the MPD, Plaintiff claims to have been targeted by the MPD in various ways. For example, Plaintiff alleges that he received a telephone call from an MPD member informing him that the MPD was angry with him for leaking the firearms story. Plaintiff also claims to have been blocked from posting on the MPD Facebook page. On November 9, 2015, Plaintiff alleges that he was subjected to a pretextual traffic stop for speeding. Plaintiff claims he was not speeding and that the officer issued him a ticket for improper window tints, which was later "thrown out" because there was no legal basis for the ticket. In March 2016, Plaintiff claims to have met an MPD officer in a parking lot where the MPD officer warned Plaintiff that the MPD would retaliate against him or his family if he did not leave the missing firearms story alone.

On March 27, 2016, Plaintiff's son, Christopher Dingwell Jr. ("Dingwell Jr."), was arrested on multiple charges after MPD officers conducted a traffic stop on a vehicle in which Dingwell Jr. was a passenger. The charges included possession of a facsimile firearm, weapon in a motor vehicle, tampering with evidence, carrying a dangerous weapon, and conspiracy to carry a dangerous weapon. Afterward, Dingwell Jr.'s arrest was publicized on the MPD Facebook page—the post included Dingwell Jr.'s mug shot, a description of the charges, and the name "Christopher Dingwell" in bold and highlighted without the suffix. The MPD also contacted the Record-Journal,

and other news outlets, to post the story as front-page news. Further, the MPD contacted Dingwell Jr.'s school to get him expelled. Plaintiff alleges that his son's arrest was publicized at the behest of Defendant Williams who, on March 27, 2016, sent an e-mail to Defendant Cossette requesting a press release of Dingwell Jr.'s arrest for immediate distribution to the local press and Facebook. In the e-mail, Defendant Williams acknowledged Plaintiff's criticism of the MPD and stated that Dingwell Jr's arrest should be exploited.

Thereafter, on September 6, 2016, Plaintiff criticized the MPD for its lack of transparency at a Meriden City Council meeting. That night, prior to the meeting, an MPD officer told Plaintiff to keep quiet during the meeting, but "[Plaintiff] continued to voice his concerns despite the rather ominous message to keep quiet at that meeting." (ECF No. 21 ¶ 43).

Plaintiff also sent e-mails to MPD officials regarding public safety issues. On November 15, 2016, in response to one of Plaintiff's e-mails, Defendant Williams threatened Plaintiff that there would be a criminal investigation if Plaintiff sent him any more e-mails that did not relate to official city business.

Plaintiff also alleges that the MPD placed a security detail on him. In December 2016, upon learning of the security detail, Plaintiff claims that he became scared to publicly criticize the MPD. As evidence of the security detail, Plaintiff alleges that an April 2017 MPD Internal Affairs report regarding the behavior of Captain Patrick Gaynor reveals that Plaintiff's conversations with Captain Gaynor were being monitored by the MPD.

Based on the foregoing, Plaintiff brought a separate cause of action against each Defendant alleging that each retaliated against him for exercising his First Amendment right to freedom of speech.

## Standard of Review

The standard under which the Court reviews motions for summary judgment is well-established. "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law," while a dispute about a material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Significantly, the inquiry conducted by the Court when reviewing a motion for summary judgment focuses on "whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id*. at 250. As a result, the moving party satisfies his burden under Rule 56 "by showing . . . that there is an absence of evidence to support the nonmoving party's case" at trial. *PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002) (per curiam) (internal quotation marks omitted). Once the movant meets its burden, "[t]he nonmoving party must set forth specific facts showing that there is a genuine issue for trial[.]" *Irizarry v. Catsimatidis*, 722 F.3d 99, 103 n.2 (2d Cir. 2013) (quoting *Rubens v. Mason*, 527 F.3d 252, 254 (2d Cir. 2008)). "[T]he party opposing summary judgment may not merely rest on the allegations or denials of his pleading" to establish the existence of a disputed fact. *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009); *accord Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990). "[M]ere speculation or conjecture as to the true nature of the facts" will not suffice. *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (citations omitted; internal quotation marks omitted). Nor will wholly implausible claims or bald assertions that are unsupported by evidence. *See Carey*

*v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991); *Argus Inc. v. Eastman Kodak Co.*, 801 F.2d 38, 45 (2d Cir. 1986). "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50 (citations omitted).

In determining whether there exists a genuine dispute as to a material fact, the Court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)). "In deciding a motion for summary judgment, the district court's function is not to weigh the evidence or resolve issues of fact; it is confined to deciding whether a rational juror could find in favor of the non-moving party." *Lucente v. Int'l Bus. Machines Corp.*, 310 F.3d 243, 254 (2d Cir. 2002).

**Discussion**

In relevant part, Section 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress[.]

42 U.S.C. § 1983. "To state a claim under Section 1983, a plaintiff must allege facts indicating that some official action has caused the plaintiff to be deprived of his or her constitutional rights— in other words, there is an injury requirement to state the claim." *Zherka v. Amicone*, 634 F.3d 642, 644 (2d Cir. 2011) (internal quotation marks and citation omitted). Specifically, a plaintiff asserting a First Amendment retaliation claim "must show: (1) he has a right protected by the First Amendment; (2) the defendant's actions were motivated or substantially caused by his exercise of

that right; and (3) the defendant's actions caused him some injury." *Dorsett v. Cty. of Nassau*, 732 F.3d 157, 160 (2d Cir. 2013).

With respect to the third element, "private citizens claiming retaliation for their criticism of public officials have been required to show that they suffered an 'actual chill' in their speech as a result." *Zherka*, 634 F.3d at 645 (internal citation omitted). Yet, "[c]hilled speech is not the *sine qua non* of a First Amendment claim. A plaintiff has standing if he can show *either* that his speech has been adversely affected by the government retaliation or that he has suffered some other concrete harm." *Dorsett*, 732 F.3d at 160. A "concrete harm" may consist of "loss of business or some other tangible injury[.]" *Zherka*, 634 F.3d at 646. While "[h]urt feelings or a bruised ego are not by themselves the stuff of constitutional tort," *id*. at 645–46, "compensable injuries may include . . . injuries such as personal humiliation and mental anguish," *Henry v. Gross*, 803 F.2d 757, 768 (2d Cir. 1986) (internal quotation marks omitted). Thus, "a campaign of harassment" resulting in "emotional distress" is a "legally recognized and compensable harm." *Bernheim v. Litt*, 79 F.3d 318, 325–26 (2d Cir. 1996).

Here, it is undisputed that Plaintiff engaged in speech critical of the MPD and its members and that such speech is protected by the First Amendment. At issue, is whether the Defendants' conduct was retaliatory, i.e., whether it was motivated by the Plaintiff's exercise of his First Amendment rights, and whether Plaintiff suffered any legally recognizable harm because of those retaliatory acts.

### Facts

The following facts are not in dispute and are taken from the Defendants' Local Rule 56(a)1 Statement (Def. SMF, ECF No. 68-2) and attached exhibits (ECF Nos. 68-3 – 68-24) and the

Plaintiff's Local Rule 56(a)2 Statement (Plf. SMF, ECF No. 71-2) and attached exhibits (ECF No. 71-3 – 71-19).[2]

Plaintiff and his son are residents of Meriden, Connecticut. Defendant Cossette was throughout the relevant time period the Chief of the Meriden Police Department. Defendant Williams was throughout the relevant time period a detective with the Meriden Police Department and also the Police Union President.

The Plaintiff has, at various times and through a variety of media, been publicly critical of the MPD and its personnel. For example, in 2013, Plaintiff created a Facebook page called "Meriden Talks" on which he has posted his criticisms of the MPD and Defendant Cossette. Additional details of the Plaintiff's public criticism of the MPD will be included as necessary.

The Plaintiff alleges several acts by the Defendants which he asserts were in retaliation for his outspoken and public criticism of the MPD. He further alleges that as a result of these acts of

---

[2] As a preliminary matter, the Court observes that Plaintiff failed to comply with District of Connecticut Local Rule of Civil Procedure 56, which requires Plaintiff's response to include "a reproduction of each numbered paragraph in the [Defendants'] Local Rule 56(a)1 Statement followed by a response to each paragraph admitting or denying the fact and/or objecting to the fact as permitted by Federal Rule of Civil Procedure 56(c)." D. CONN. L. CIV. R. 56(a)2(i), which Plaintiff did not do. Consequently, "[w]here a party fails to appropriately deny material facts set forth in the moving party's 56(a)1 statement, and where those facts are supported by evidence in the record, those facts are deemed to be admitted." *Miron v. Town of Stratford*, 976 F. Supp. 2d 120, 127 (D. Conn. 2013); *see also Knight v. Hartford Police Dep't*, No. 3:04CV969 (PCD), 2006 WL 1438649, at *4 (D. Conn. May 22, 2006) ("When a party fails to appropriately deny material facts set forth in the movant's Rule 56(a)(1) statement, those facts are deemed admitted."). Accordingly, to the extent the facts within Defendants' Local Rule 56(a)1 Statement are adequately supported by evidence within the record, the Court will deem them admitted by Plaintiff unless they are otherwise "controverted by [Plaintiff's] Local Rule 56(a)2 Statement[.]" D. CONN. L. CIV. R. 56(a)1. The Court further observes that Plaintiff submitted what appears to be the "Additional Material Facts" portion of the Local Rule 56(a)2 Statement although it was mislabeled as a Local Rule 56(a)(1) Statement. *See* D. CONN. L. CIV. R. 56(a)2(ii) ("The Local Rule 56(a)2 Statement must also include a separate section entitled 'Additional Material Facts' setting forth in separately numbered paragraphs meeting the requirements of Local Rule 56(a)3 any additional facts, not previously set forth in responding to the movant's Local Rule 56(a)1 Statement, that the party opposing summary judgment contends establish genuine issues of material fact precluding judgment in favor of the moving party."). However, many of Plaintiff's statements of material fact are not "followed by a specific citation to (1) the affidavit of a witness competent to testify as to the facts at trial, or (2) other evidence that would be admissible at trial." D. CONN. L. CIV. R. 56(a)3. In this regard, Plaintiff's failures "frustrate [Local] Rule 56(a)'s purpose of clarifying whether a genuine dispute of material fact exists." *Zamichiei v. CSAA Fire & Cas. Ins. Co.*, No. 3:16-cv-00739 (VAB), 2018 WL 950116, at *1 n.1 (D. Conn. Feb. 20, 2018) (quoting *Liston-Smith v. CSAA Fire & Cas. Ins. Co.*, 287 F. Supp. 3d 153, 156 n.2 (D. Conn. 2017)). Thus, to the extent Plaintiff's Local Rule 56(a)2 Statement does not comply with Local Rule 56(a)3, the Court will deem "admitted certain facts [within Defendants' Local Rule 56(a)1 Statement] that are supported by the evidence in accordance with Local Rule 56(a)1" for the purpose of resolving this motion. D. CONN. L. CIV. R. 56(a)3.

retaliation "his First Amendment right of speech has been chilled and/or substantially curtailed for fear of retaliation against him, both directly and indirectly by targeting his family, and therefore, his rights have been unlawfully abridged." (*See*, *e.g.*, ECF No. 21 at 10). The Court observes at the outset that this is the ***only*** harm alleged by the Plaintiff. He alleges no other harm resulting from the Defendants' alleged retaliatory conduct.

With respect to all but one purportedly retaliatory event, the blocking of the Plaintiff from the MPD Facebook page, the Plaintiff has failed to raise a genuine issue of material fact because it is uncontroverted that the Plaintiff's free speech was not chilled or curtailed in any fashion and he has alleged no other cognizable harm arising from the conduct at issue.[3]

### March 2016 Publication of Dingwell Jr.'s Arrest

On March 27, 2016, Plaintiff's son, Dingwell Jr., was arrested by MPD officers after a traffic stop. Upon determining that Dingwell Jr. threw a facsimile firearm out of the vehicle prior to the traffic stop and that he possessed brass knuckles, Dingwell Jr. was charged with Possession of a Facsimile Firearm, Weapon in a Motor Vehicle, Tampering with Evidence, Carrying a Dangerous Weapon, and Conspiracy to Carry a Dangerous Weapon. Neither Defendant Cossette nor Defendant Williams were involved in the arrest.[4] However, later that day, Defendant Williams became aware of Dingwell Jr.'s arrest and sent an e-mail regarding the arrest to Defendant Cossette and Officer Mark Walerysiak, among others. Defendant Williams began the e-mail with a request—"[a]s Union President, I am respectfully requesting that the Police Department complete a press release for distribution tomorrow to not only our local press but our Facebook as well."

---

[3] Plaintiff claims no emotional harm as a result of the Defendants' alleged retaliatory conduct. (*See* Def. SMF, ECF No. 68-2 ¶ 81; Pl. Dep., ECF No. 68-3 at 56; *see*, *e.g.*, Pl. Interrog., ECF No. 68-11 at 4 (noting, "[Plaintiff] is not making a claim for mental, psychological or emotional problems[.]")).

[4] Plaintiff makes no claim that the arrest was retaliatory and it is conceded that there was probable cause for the arrest.

(ECF No. 71-18 at 2). He then describes the arrest noting the involvement of "Chris Dingwells other son" and the importance of its publication as follows:

> More importantly is the fact that [Plaintiff] is one of the most outspoken citizens against this Administration and Department. Yet, here is the second of his two kids who are criminals and creating crime in our City. This case should be exploited for what it is, not only excellent work on the part of our men and women of this agency but the fact that this is the guy who touts his inner knowledge and workings of the Police Department and has an association with a rat or two from within our Department. Yet he does not [sic] nothing to make this Community better and instead has created drama for the real citizens of this City. Thank you for your consideration on this request.

(*Id*.).

The next day, on March 28, 2016, Officer Walerysiak posted a summary of Dingwell Jr.'s arrest on the MPD Facebook page. (*See* ECF No. 68-13). The post included the mugshots of Dingwell Jr. and another man arrested during the traffic stop. The arrestees' names were highlighted in yellow under their mugshots and Dingwell Jr. was identified as "Christopher Dingwell." (*Id*.).

As discussed above, to succeed on a First Amendment retaliation claim, a plaintiff must show that "the retaliation resulted in 'actual chilling' of [his] exercise of [his] constitutional right to free speech." *Zherka*, 634 F.3d at 643. Therefore, "[w]here a party can show no change in his behavior, he has quite plainly shown no chilling of his First Amendment right to free speech." *Curley v. Vill. of Suffern*, 268 F.3d 65, 73 (2d Cir. 2001). Here, the record reveals that Plaintiff did not stop criticizing the MPD or its members due to the publication of Dingwell Jr's arrest. (*See* Def. SMF, ECF No. 68-2 ¶ 62 (noting that Plaintiff has engaged in public speech critical of the MPD on a regular basis)). For example, on April 11, 2016, only weeks after the publication of Dingwell Jr.'s arrest, Plaintiff posted a message on a social media website criticizing the MPD for firing African-American police officers and its lack of transparency. (ECF No. 68-23 at 2). Then,

on August 7, 2016, Plaintiff criticized Defendant Cossette for allegedly preventing MPD officers from talking to the press, calling it "[c]ensorship at its best." (ECF No. 68-23 at 8–9). In the same post, Plaintiff again criticized the "leaders at the police department" for their lack of transparency. (*Id.*). About a week later, on August 16, 2016, Plaintiff posted a message stating that "[t]here is ZERO transparency at the police department and [whose] fault you ask? Our chief, our leaders at City Hall . . . THEY do NOT care about US[.]" (ECF No. 68-23 at 10–11). Plaintiff's criticism of the MPD and its leadership was not confined to social media. On September 6, 2016, Plaintiff criticized the MPD at a Meriden City Council meeting. (Def. SMF, ECF 68-2 ¶ 54; Am. Compl., ECF No. 21 ¶ 40 ("On or about September 6, 2016, Mr. Dingwell engaged in speech publicly, at the City Council meeting, openly criticizing the lack of transparency with the Meriden Police Department and its citizens."); Pl. Dep., ECF No. 68-3 at 33–35 (confirming attendance and speech at September 6, 2016 City Council meeting)). Clearly, Plaintiff continued to criticize the MPD and its leadership despite the publication of Dingwell Jr.'s arrest. Accordingly, there is no triable issue as to whether Plaintiff's speech was actually "chilled" or curtailed in any fashion and the publication of Dingwell Jr's arrest cannot support a First Amendment retaliation claim against any Defendant.[5]

Moreover, although there is no question that Defendant Williams sent the e-mail to Defendant Cossette, it is also undisputed that neither Defendant was involved in the actual publication of the arrest. The parties agree that Officer Walerysiak was responsible for the Facebook post. (*See* Plf. SMF, ECF No. 71-2 ¶ 39; Def. SMF, ECF No. 68-2 ¶ 37) and Plaintiff is

---

[5] Although not alleged in the amended complaint as such, because it is undisputed that Dingwell Jr's arrest was supported by probable cause, the arrest itself cannot satisfy the "cognizable harm" requirement of a First Amendment retaliation claim. *See Curley*, 268 F.3d at 73 (finding that the district court properly granted summary judgment because "plaintiff's arrest was made on probable cause and had no effect on his exercise of First Amendment rights"). Similarly, there is no claim that Dingwell Jr. suffered any school-related consequences as a result of his arrest or the publication of same.

deemed to have admitted that "[n]either [Defendant Cossette nor Defendant Williams] played any role in the posting of information or photos regarding the March 27, 2016 arrests of Christopher Dingwell, Jr. and [the other arrestee] on the MPD Facebook page." (Def. SMF, ECF No. 68-2 ¶ 41). Indeed, Defendant Cossette merely received and read Defendant Williams' e-mail. (Def. SMF, ECF No. 68-2 ¶ 36). Defendant Cossette did not respond to the e-mail or take any other action in response. (Def. SMF, ECF No. 68-2 ¶ 36). Accordingly, it is undisputed that neither Defendant Cossette nor Defendant Williams participated in the alleged retaliatory conduct consisting of the publication of Dingwell Jr.'s arrest.[6] It is axiomatic that personal involvement in the alleged constitutional deprivation is a prerequisite to recovery under Section 1983. *See Williams v. Smith*, 781 F.2d 319, 323 (2d Cir. 1986) ("Accordingly, personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under [Section 1983]." (internal quotation marks omitted)).

Plaintiff ignores this dearth of evidence and asserts, without authority, that Defendant Cossette, as the Chief, should have prevented Officer Walerysiak from posting the arrest summary on the MPD Facebook page and is, therefore, liable for this failure. Plaintiff also offers little by way of analysis beyond a series of unsubstantiated accusations that Defendant Cossette has a "pattern and practice" of silencing those who speak against him. In any event, whether Defendant Cossette may be held liable for his alleged failure to stop the posting, *see Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995) ("The personal involvement of a supervisory defendant may be shown by evidence that . . . the defendant was grossly negligent in supervising subordinates who

---

[6] For the same reasons, nor does the record before the Court raise a genuine issue as to whether Officer Walerysiak's conduct in posting the arrest information was motivated by Defendant Cossette's or Williams' intent to retaliate against Plaintiff for the exercise of his First Amendment rights.

committed the wrongful acts[.]"), as discussed above, the undisputed facts show that Plaintiff suffered no legally recognizable harm resulting from the publication of his son's arrest.

**Defendant Williams' November 2016 E-mail**

In November 2016, Plaintiff and Defendant Williams engaged in an e-mail exchange. (*See* ECF No. 68-14). On November 14, 2016, it appears that Plaintiff began the conversation accusing Defendant Williams of taking "a jab [at] a fellow union member." (*Id.*). On November 15, 2016, Defendant Williams responded to Plaintiff as follows:

> This is your official notice that the e-mail you are using is a City e-mail for City business. Although the Union has the right to use it for Union business, citizens do not have the right to mis-use it to harass City employees. *Any further e-mails from you to me that are not official City business will be followed up with a Criminal investigation.*

(*Id.* (emphasis added)). A few hours later, Plaintiff replied accusing Defendant Williams of losing his mind, suggesting, *inter alia*, that Defendant Williams retire or receive training, and noting that Defendant Williams' response "is the problem with policing in today['s] society[,] there is no dialogue between citizens and police." (*Id.*). Thereafter, on November 20, 2016, Plaintiff filed a formal complaint against Defendant Williams with the MPD regarding the e-mail from Defendant Williams. (*See* ECF No. 68-18). In the complaint to the MPD, Plaintiff states, "I received an internet communication from Detective John Williams threatening and intimidating me . . . . I'm fearful for my life and my reputation as a[n] upstanding citizen of Meriden is on the line . . . . To reiterate[,] I'm fearful that this officer will retaliate against me or my family." (*Id.* at 3). In response, the MPD investigated Plaintiff's complaint and determined that it was unfounded. (*Id.*). It appears that the investigation ended on March 15, 2017. (*Id.* at 7).

As to the claim that Defendant Williams' e-mail was a retaliatory threat, once again, the record reveals that Plaintiff's free speech was not chilled or curtailed in any fashion following

these events. On the contrary, the Plaintiff's own response to the e-mail all but establishes that the

Plaintiff's exercise of free speech was not curtailed. Plaintiff responded:

> Johnny,
>
> I really think you have lost your mind. I'm quite positive IF I requested an FOI for this email account it's NOT all city business.
>
> This is the problem with policing in today society there is no dialogue between citizens and police. Well NOT in this City.
>
> I took the liberty to Cc our city manager, the head of the public safety committee and the Record Journal, just to show them the lack of chivalry this department has. NOW you're threatening me for emailing you concerns and complements. Get over yourself Jonathan.
>
> You may want to gaze in the mirror and realize you are a public official paid for by the citizens of Meriden. Coming up to 30 years on one job or any job for that matter is a long time. WE become complacent and miserable.
>
> May I suggest you think of retiring or I strongly suggest some much needed training, maybe a interpersonal communication training class will do the job. Having so much time on the job one would think you're burnt out or just need a break. Whatever it is maybe a breathing regiment for relaxation is the way to go.
>
> Have a great night.
>
> Sincerely yours,
>
> Chris Dingwell
> "silence & integrity
> are not the same"

(ECF No. 68-14 at 2).

In addition, Plaintiff continued to publicly criticize the MPD or its members even while

the MPD's investigation into Defendant Williams' alleged e-mail threat was ongoing. For

example, on December 22, 2016, in a social media post, Plaintiff criticized the MPD for its

employment decisions:

> So, here it is Meriden. As YOU all know Capt. Gaynor is exit left at 50 WestMain St we have discovered that NOT only is Gaynor out so are 4 other cops who

substantiated his claim. Lesson learned don't you cross the BLUE line of lies, deceit and YES even when YOU'RE right YOU'RE wrong. CBS has Blue Bloods, Meriden has STFU or you're fired!

(ECF No. 68-23 at 17). After the investigation closed, on April 12, 2017, Plaintiff, by Facebook post, appears to accuse the Meriden Mayor, Defendant Cossette, and the MPD of not doing anything about missing guns and money. (ECF No. 68-19; Pl. Dep., ECF No. 68-4 at 29–31). On April 26, 2017, Plaintiff posted the following: "MPD where silence and integrity are the same so sad, WE all witnessing the real life Titanic.. YOU wonder why moral[e] is circling the drain[.]" (ECF No. 68-23 at 20). Plaintiff also admitted that his July 15, 2017 social media post regarding a potential conflict of interest at a local news outlet was critical of Defendant Cossette and his wife. (ECF No. 68-23 at 9; Pl. Dep., ECF No. 68-4 at 41–42). Plaintiff even publicly criticized the MPD after filing the instant lawsuit on August 9, 2017 in which he claims to have had his free speech rights chilled. (*See* ECF No. 68-20 (February 7, 2019 tweet accusing the MPD of wrongfully releasing confidential information); ECF No. 68-21 (February 10, 2019 tweet criticizing the MPD by suggesting that Meriden citizens are safer protecting themselves)). Thus, there is no genuine dispute that Plaintiff did not suffer any cognizable harm as a result of Defendant Williams' alleged e-mail threat. Accordingly, Defendant Williams' November 2016 e-mail cannot support a First Amendment retaliation claim against any Defendant.

**November 9, 2015 Traffic Stop**

In his amended complaint, Plaintiff alleges that he was stopped by an MPD officer under the pretext of speeding. (ECF No. 21 ¶ 23). After telling the officer that he was not speeding, Plaintiff alleges that the officer gave him a ticket for improper window tints even though the officer did not have his laser to test the window. (*Id.*). Plaintiff claims the ticket "was thrown out as there was no legal basis for it." (*Id.*). Although Plaintiff's deposition testimony provides evidence

suggesting that there was a motor vehicle stop and that an officer issued Plaintiff a citation for improper window tints, (*see* Pl. Dep., ECF No. 68-4 at 48–51), Plaintiff identifies no evidence which would support the inference that the stop was retaliatory and the result of Plaintiff's public criticism of the MPD.  Further, Plaintiff offers no evidence that any Defendant participated in or was even aware of this interaction. *See Williams*, 781 F.2d at 323 ("Accordingly, personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under [Section 1983]." (internal quotation marks omitted)). And as discussed above, the Plaintiff frequently publicly criticized the MPD and its personnel after November 9, 2015 such that no cognizable harm occurred as a result of this stop, even if it is viewed as retaliatory. Thus, this incident cannot support a First Amendment retaliation claim against any Defendant.

**Surveillance**

Plaintiff alleges that the MPD surveilled Plaintiff to intimidate him into not publicly criticizing the MPD.  In this regard, Plaintiff offers little more than his own speculation. Indeed, Plaintiff provides no citation to the record for the following "material fact": "Dingwell is being surveilled and was actually engaged in a high-speed highway chase while attempting to get away from this vehicle." (Plf. SMF, ECF No. 71-2 ¶ 48). Plaintiff also admitted during his deposition that it is merely his own conjecture and speculation that the MPD put a "security detail" on him. (Pl. Dep., ECF No. 68-4 at 26–28; Pl. Dep., ECF No. 68-3 at 50–51). Additionally, MPD Officer Jeffrey Selander denies Plaintiff's claim that he told Plaintiff that Defendant Cossette directed MPD officers to watch Plaintiff (Pl. Interrog., ECF No. 68-11 at 3; Pl. Dep., ECF No. 68-3 at 55; Selander Dep., ECF No. 68-7 at 8–9). Officer Selander also denies Plaintiff's claim that he told Plaintiff that Defendant Cossette had formed a task force to surveil Plaintiff (Selander Dep., ECF No. 68-7 at 14).

And Plaintiff points to no evidence in the record that the Defendants actually conducted improper surveillance of Plaintiff. While Plaintiff points to specific events to support this allegation, the events relied upon simply do not give rise to the inference he urges. For example, Plaintiff states in his affidavit: "I also believe that the police have been surveilling me and/or hired a third party to do so because on at least one occasion, on November 9, 2017, they made a traffic stop of my vehicle very close in time to my arrival at a particular location," and "[m]y son, Christopher Jr. was pulled over on or around August 28, 2018 for purportedly being on his cell phone at the time while driving my car." (Pl. Aff., ECF No. 71-7 ¶¶ 59, 61). Allegations regarding two traffic stops of two different people occurring almost a year apart, and *after* the amended complaint was filed, is not sufficient evidence that the MPD conducted improper surveillance of Plaintiff so as to raise a genuine issue of material fact on this issue. Further, there is no evidence put forward that either Defendants Cossette or Williams knew about these traffic stops or were in any way involved in these stops. Finally, the record is bereft of any evidence from which an inference could be drawn that these stops were motivated by Plaintiff's protected speech.

Notwithstanding this dearth of evidence, Plaintiff claims that an Internal Affairs report regarding an investigation into the improper conduct of former MPD Captain Patrick Gaynor establishes a genuine issue of material fact as to whether he was subject to improper surveillance by the MPD. (*See* ECF No. 71-8). In the Internal Affairs report, Captain Gaynor's phone records were reviewed with specific attention to his contacts with Plaintiff in order to determine whether Captain Gaynor was leaking information to Plaintiff in violation of MPD policy. (*See* ECF No. 71-8 at 7). However, the Internal Affairs report makes no mention of active surveillance or monitoring of Plaintiff. Rather, the Internal Affairs report simply notes the timing and duration of past phone conversations between Captain Gaynor and Plaintiff. Accordingly, the Plaintiff has not

raised a genuine issue of material fact with respect to his allegations that he was improperly surveilled in retaliation for the exercise of his First Amendment rights.

However, as discussed above, even if a genuine issue of fact could be gleaned from the record, Plaintiff has been undeterred in his open and public criticism of the MPD. His speech has not been chilled or curtailed by any of the alleged retaliatory actions discussed above.

**MPD Officer Warnings**

Plaintiff alleges that various MPD officers and city officials either warned Plaintiff not to criticize the MPD or were instructed by Defendant Cossette to not speak with Plaintiff. Again, Plaintiff provides little evidence beyond his own allegations to support this claim. For example, in Plaintiff's Statement of Material Facts, Plaintiff simply states, "[I] was also warned by Larue Graham[, of the Public Safety Committee,] that if they could not get to [me], they would get to [my] family members." (Pl. SMF, ECF No. 71-2 ¶ 36). Plaintiff provides no clarification regarding who "they" are and, more importantly, provides no evidence in the record which would establish this material fact.

However, regardless of whether a factual dispute exists as to whether Plaintiff was warned to stop publicly criticizing the MPD, it is clear he did not do so and he therefore suffered no legally cognizable harm. For example, Plaintiff alleges that MPD Lieutenant George DelMastro told Plaintiff "to keep quiet and lay low" during the September 6, 2016 Meriden City Council meeting. (Am. Compl., ECF No. 21 ¶ 42; Pl. Interrog., ECF No. 71-16 at 5). However, as previously discussed, Plaintiff admittedly criticized the MPD at the September 6, 2016 Meriden City Council meeting. (Am. Compl., ECF No. 21 ¶ 40 ("On or about September 6, 2016, Mr. Dingwell engaged in speech publicly, at the City Council meeting, openly criticizing the lack of transparency with the Meriden Police Department and its citizens."); Pl. Dep., ECF No. 68-3 at 33–35 (confirming

attendance and speech at September 6, 2016 City Council meeting)). Similarly, a few weeks before Dingwell Jr.'s arrest in March 2016, Plaintiff alleges that he met with Officer Selander who told Plaintiff that Plaintiff should stop criticizing Defendant Cossette lest there be "backlash," including the arrest of Plaintiff's son. (Am. Compl., ECF No. 21 ¶ 24; Pl. Interrog., ECF No. 68-11 at 4). Although Officer Selander denies this claim, as discussed above, there is no genuine dispute that Dingwell Jr.'s arrest was made for legitimate reasons. *See Curley*, 268 F.3d at 73 (finding that the district court properly granted summary judgment because "plaintiff's arrest was made on probable cause and had no effect on his exercise of First Amendment rights"). Accordingly, these purported warnings cannot support a First Amendment retaliation claim against any Defendant.

### 2015 Facebook Blocking

Plaintiff alleges that Defendant Cossette and Defendant Meriden are liable as a result of the decision to block him from posting to the MPD Facebook page in 2015. Preliminarily, the Court observes that precluding the Plaintiff from posting on the MPD Facebook page is a cognizable harm as Plaintiff's speech in that forum was not only chilled but precluded altogether. In the Second Circuit, "the First Amendment does not permit a public official who utilizes a social media account for all manner of official purposes to exclude persons from an otherwise-open online dialogue because they expressed views with which the official disagrees." *Knight First Amendment Inst. at Columbia Univ. v. Trump*, 928 F.3d 226, 230 (2d Cir. 2019). In *Trump*, the court found that President Donald J. Trump created a government-controlled public forum through the use of his Twitter account for presidential business and interaction with the public. *Id*. at 236. Accordingly, the court found that President Trump, acting in his capacity as the President, violated the First Amendment by blocking individuals who expressed views with which he disagreed from his Twitter account. *Id*. at 239.

With respect to this claim, the evidence of record reveals the following. In November 2014, MPD Officer Walerysiak, with Defendant Cossette's permission, created an MPD Facebook page in order to inform the public about MPD activities within the Meriden community. The MPD Facebook page allows the administrator, who at all relevant times was Officer Walerysiak, to post information in the middle column of the page. Once the information is posted, all other Facebook users are able comment on the posts. However, at some point in 2015, Officer Walerysiak, in consultation with Defendant Cossette, blocked Plaintiff from commenting on the MPD Facebook page. The Defendants assert that the Plaintiff's posts were defamatory, inappropriate and harassing.[7] The Plaintiff contacted the ACLU and the town attorney and within a relatively short period of time, his posting privileges were restored. Plaintiff remained blocked for at most, one month.

As to this claim, genuine issues of material fact remain in dispute to include, it appears, whether the Plaintiff's posts were protected speech. For purposes of this decision, the Court assumes without finding that the Plaintiff's posts were protected speech and that the decision to block the Plaintiff was retaliatory and curtailed his First Amendment rights. Notwithstanding, summary judgment in favor of Defendant Cossette is still appropriate because he is entitled to qualified immunity.

"[Q]ualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (internal quotation marks omitted). The protection of qualified immunity attaches unless the

---

[7] In Plaintiff's opposition to Defendants' motion for summary judgment, Plaintiff alleges that he was also blocked from posting on the MPD's Twitter account. This allegation was not raised in Plaintiff's operative amended complaint. Accordingly, the Court will not consider Plaintiff's allegation regarding allegedly being blocked from MPD's Twitter account.

plaintiff demonstrates "(1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (internal quotation marks omitted). A right is "clearly established" if "(1) the right was defined with reasonable clarity, (2) the Supreme Court or the Second Circuit has confirmed the existence of the right, and (3) a reasonable defendant would have understood from the existing law that his conduct was unlawful." *Bailey v. Pataki*, 708 F.3d 391, 404–05 (2d Cir. 2013).

Here, Plaintiff's First Amendment right to comment on the MPD Facebook page was not clearly established in 2015. Indeed, the law regarding whether the First Amendment is implicated when a government official blocks someone from government-controlled social media platforms was not clearly established until the Second Circuit's decision in *Trump*, issued by the court in 2019, affirming a 2018 decision issued by Judge Naomi Reice Buchwald of the Southern District of New York. *See Knight First Amendment Inst. at Columbia Univ. v. Trump*, 302 F. Supp. 3d 541, 580 (S.D.N.Y. 2018), *aff'd*, 928 F.3d 226 (2d Cir. 2019). In this case, Plaintiff was blocked from posting on the MPD Facebook page years before either *Trump* decision. Defendant Cossette would therefore not have understood from the existing law that his conduct was unlawful. *Bailey*, 708 F.3d at 405; *see also Hyman v. Kirksey*, No. 3:18-CV-230-DPM, 2019 WL 2323864, at *2 (E.D. Ark. May 30, 2019) (finding that the Chief of Police was entitled to qualified immunity for deleting plaintiffs' social media posts in spring 2018 because the law regarding the plaintiffs' right to be heard on the police department's Facebook page was not clearly established).

**Claims against Meriden**

Plaintiff alleges that Meriden has municipal liability because the "City Manager, Mayor and the Public Safety Committee Members became aware that Chief Cossette and Detective

Williams had engaged in activities that had violated and were continuing to violate Mr. Dingwell's First Amendment rights; yet failed to take any affirmative action to stop Chief Cossette and Detective Williams from said unlawful activities." (Am. Compl., ECF No. 21 at 12, ¶ 60).

As discussed above, the Plaintiff has not identified genuine issues of material fact as to whether Plaintiff's First Amendment retaliation claim against Defendants Cossette or Williams present triable issues, the only exception being Defendant Cossette's decision to block Plaintiff from posting on the MPD Facebook page. And because Meriden, as a municipality, is not entitled to qualified immunity, *Sadallah v. City of Utica*, 383 F.3d 34, 37 (2d Cir. 2004) ("Qualified immunity is not available to municipalities in cases under [Section 1983].), the Court next takes up the question of municipal liability arising out of the decision to block the Plaintiff's ability to post on the MPD Facebook page.

A "municipality cannot be held liable *solely* because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under [Section 1983] on a *respondeat superior* theory." *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 691 (1978) (emphasis in original). "Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under [Section 1983]." *Id*. at 694. "Where plaintiffs allege that their rights were deprived not as a result of the enforcement of an unconstitutional official policy or ordinance, but . . . by a city employee's single tortious decision or course of action, the inquiry focuses on whether the actions of the employee in question may be said to represent the conscious choices of the municipality itself." *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 126 (2d Cir. 2004). "Such an action constitutes the act of the municipality and therefore provides a basis for municipal liability where it is taken by, or is attributable to, one of

the city's authorized policymakers." *Id*. In other words, "municipal liability under [Section 1983] attaches where—and only where—a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986). Additionally, "[t]he plaintiff must also demonstrate that, through its *deliberate* conduct, the municipality was the 'moving force' behind the injury alleged. That is, a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights." *Bd. of Cty. Comm'rs of Bryan Cty., Okl. v. Brown*, 520 U.S. 397, 404 (1997) (emphasis in original).

Plaintiff does not allege that the decision to block him from posting on the MPD Facebook page was the result of any municipal policy or custom and nor is there any evidence to that effect. Indeed, it is undisputed that there was no policy in effect at all with respect to regulating, restricting or allowing public comment on the MPD Facebook page in 2015. Rather Plaintiff alleges that municipal liability arises out of the failure to properly oversee Defendant Cossette and the failure to intervene when the mayor and others learned of the constitutional violations. Even if this was a valid basis upon which to assert and establish municipal liability,[8] which the Court does not determine, there is no evidence that the Mayor, City Manager, Public Safety Committee or other municipal leaders, with the exception of corporation counsel, were made aware of the events surrounding the decision to block Plaintiff from being able to post on the MPD Facebook page prior to the restoration of Plaintiff's ability to do so. And when corporation counsel was advised, she stepped in and the Plaintiff's access was restored. Accordingly, there is no issue to be tried as

---

[8] These allegations sound very much like liability premised upon a *respondeat superior* theory, which, as indicated is not a basis upon which a municipality can be held liable under Section 1983. *Monell*, 436 U.S. at 691.

to whether Meriden has municipal liability for failing to intercede in the determination to block Plaintiff from posting to the MPD Facebook page.

In his opposition to the motion for summary judgment, Plaintiff does assert that the Meriden Charter renders the policies of Chief Cossette the policies of the City of Meriden so that Chief Cossette's "pattern of censorship," to include the decision to block the Plaintiff's ability to post on the MPD Facebook page, is attributable to the municipal defendant. (ECF No. 71-1 at 9–10). Whether the Meriden Charter renders Defendant Cossette a "policymaker" for purposes of *Monell* liability such that the decision to block the Plaintiff from posting is attributable to the municipality is a question of state law, *see Roe v. City of Waterbury*, 542 F.3d 31, 37 (2d Cir. 2008), which neither party has adequately addressed. The Defendants do not address this legal issue at all, notwithstanding Plaintiff's opposition in which, albeit inartfully, he raises the issue.[9] The Court also observes that Judge Bryant discussed this issue in the context of the Defendants' motion to dismiss and determined that the allegations plausibly alleged that Defendant Cossette was a "policymaker" for purposes of municipal liability. *Dingwell v. Cossette*, 327 F. Supp. 3d 462, 475 (D. Conn. 2018). Accordingly, the Defendant City of Meriden has not met its initial burden of proof that it is entitled to judgment as a matter of law on Count Three arising out of Defendant Cossette's decision to block the Plaintiff from posting on the MPD Facebook page.

Accordingly, the motion for summary judgment as to Count Three, against the municipality, is denied.

---

[9] Similarly, Plaintiff summarily asserts that the provisions of the Meriden Charter render Defendant Cossette's decision attributable to the City without citation to authority or any analysis with respect to the content and meaning of the Charter provisions.

**Conclusion**

For the foregoing reasons, Defendants' Motion for Summary Judgment is GRANTED in part and DENIED in part. Judgment shall enter in favor of Defendants Cossette and Williams.

**SO ORDERED** at Bridgeport, Connecticut, this 30th day of September 2020.

        _/s/ Kari A. Dooley_____
KARI A. DOOLEY
UNITED STATES DISTRICT JUDGE